# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

Sarah Zito, Alvaro Sarmiento, Jr., Mark Shinn, and Daniel Bermudez, Appellants,

v.

Strata Audubon, LLC and Strata Veridian, LLC, Respondents.

Appellate Case No. 2024-000208

———————

Appeal From The Public Service Commission

———————

Opinion No. 6129
Heard May 6, 2025 – Filed January 14, 2026

———————

**AFFIRMED**

———————

Frederick Elliotte Quinn, IV, and Rachel Igdal, both of The Steinberg Law Firm, LLP, of North Charleston, for Appellants.

Kevin A. Hall and Bryant Sparks Caldwell, both of Womble Bond Dickinson (US), LLP, of Columbia, for Respondents.

———————

**MCDONALD, J.:** Sarah Zito, Alvaro Sarmiento, Jr., Mark Shinn, and Daniel Bermudez (collectively, Appellants) appeal the Public Service Commission's orders dismissing their complaint. Appellants argue the Commission erred in: (1) holding Strata Audubon, LLC and Strata Veridian, LLC (collectively, Respondents) did not operate as a public utility; (2) deviating from prior orders

without a reasoned basis; and (3) making immaterial factual findings not supported by substantial evidence. We affirm the orders of the Public Service Commission.

**Facts and Procedural History**

Zito and Sarmiento were tenants at the Audubon Park Apartments (Audubon) in Berkeley County. Strata Audubon owns the Audubon property, which consists of thirteen buildings and more than 250 apartments. Similarly, Shinn and Bermudez were tenants at the Grove Apartments (Veridian) in Spartanburg County—a Strata Veridian-owned property consisting of thirteen buildings and more than 175 apartments. Appellants claim Strata Equity Group, Inc. (Strata Equity) owns, controls, and directs both Strata Audubon and Strata Veridian, while Pinnacle Property Management Services, LLC manages the Audubon and Veridian apartments for Respondents. Because Respondents do not have water or sewer submetering infrastructure at either Audubon or Veridian, Respondents contracted with Conservice, LLC to bill tenants for water and sewer services.

The lease Strata Audubon entered with Zito and Sarmiento (the Audubon lease) includes a "Utility and Services Addendum," which provides that water and sewer utilities "will be billed by the service provider to us and then allocated to you based on the . . . number of persons residing in your dwelling unit." The leases between Strata Veridian and Shinn and Bermudez (the Veridian leases) likewise include a "Utility and Services Addendum" providing water and sewer "will be billed by the service provider to us and then allocated to you based on . . . a combination of square footage of your dwelling unit and the number of persons residing in your dwelling unit."

Appellants initially filed an action in the Berkeley County Court of Common Pleas in which they requested "a finding and declaration that the rates charged by Defendants for water and sewage are unlawful because not approved by the Commission." Respondents removed that case to federal court and later moved to dismiss it. The United States District Court for the District of South Carolina subsequently dismissed the case "without prejudice based on [Appellants'] failure to exhaust the available administrative remedies." *Zito v. Strata Equity Grp., Inc.*, No. 2:20-CV-3808-BHH, 2021 WL 4137553, at *4 (D.S.C. Sept. 10, 2021).[1]

---

[1] Because the Commission "issued a binding order on the matter during the pendency" of Appellants' federal appeal, the Fourth Circuit later remanded the case "to the district court for consideration in the first instance." *See Zito v. Strata*

Following the district court's dismissal, Appellants filed this action before the Commission, and Respondents again moved to dismiss certain claims. After the Commission granted this motion as to some of these claims, Respondents requested an order finding no testimonial hearing was required in the customer complaint proceeding and sought dismissal based on the written record. In response, Appellants sought an order granting the complainants relief based on the written record or, in the alternative, setting a scheduling order and hearing. The Commission dismissed Appellants' complaint based on the written record. Appellants moved for reconsideration of this order (Order 736), and on January 18, 2024, the Commission denied this motion. Appellants timely appealed.

**Standard of Review**

"We review questions of statutory interpretation de novo." *Books-A-Million, Inc. v. S.C. Dep't of Revenue*, 437 S.C. 640, 642-43, 880 S.E.2d 476, 477 (2022). "An appellate court must affirm the [findings of fact of an administrative body] if substantial evidence supports them." *Contreras v. St. John's Fire Dist. Comm'n*, 442 S.C. 596, 610, 900 S.E.2d 463, 471 (Ct. App. 2024), *cert. denied*, S.C. Sup. Ct. order dated Oct. 2, 2024. "A court may reverse or modify [an administrative body's] decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions[,] or decisions are affected by other error of law." *Id.* (second alteration in original) (quoting *Muir v. C.R. Bard, Inc.*, 336 S.C. 266, 282-83, 519 S.E.2d 583, 591 (Ct. App. 1999)).

**Analysis**

I.  **Section 58-5-10(4)**

Appellants assert the Commission erred in finding Respondents did not operate as a public utility. Their primary argument is that "the language of Section 58-5-10(4) [of the South Carolina Code (2015)] plainly and unambiguously provides that all that is required for an entity to be a regulated public utility is for the entity to supply water or wastewater to a portion of the public for compensation, and therefore, Respondents' conduct made them a regulated public utility." We disagree.

---

*Equity Grp., Inc.*, No. 22-1877, 2023 WL 8712054, at *2 (4th Cir. Dec. 18, 2023) (per curiam).

By statute, the Commission governs public utility rates and services:

>The Public Service Commission is hereby, to the extent granted, vested with power and jurisdiction to supervise and regulate the rates and service of every public utility in this State, together with the power, after hearing, to ascertain and fix such just and reasonable standards, classifications, regulations, practices and measurements of service to be furnished, imposed, observed and followed by every public utility in this State and the State hereby asserts its rights to regulate the rates and services of every "public utility" as herein defined.

S.C. Code Ann. § 58-5-210 (2015). The questions before us involve the statutory definitions of "public utility" and "public or any portion thereof":

>(4) The term "public utility" includes every corporation and person delivering natural gas distributed or transported by pipe, and every corporation and person *furnishing or supplying in any manner* heat (other than by means of electricity), *water, sewerage collection, sewerage disposal*, and street railway service, or any of them, *to the public, or any portion thereof, for compensation*; provided, however, that a corporation or person furnishing, supplying, marketing, and/or selling natural gas at the retail level for use as a fuel in self-propelled vehicles is not a public utility by virtue of the furnishing, supplying, marketing, and/or selling of natural gas and a corporation or person whose only purpose is the furnishing, supplying, marketing, and/or selling of treated effluent for irrigation purposes is not a public utility by virtue of the furnishing, supplying, marketing, and/or selling of treated effluent if the effluent is not permitted for consumption by a regulatory agency.

>(5) The term "public or any portion thereof" means the public generally, or any limited portion of the public, including a person, private corporation, municipality, or any political subdivision of the State for which the service is performed or to which the commodity is

delivered and whenever such corporation or person performs a service or delivers a commodity to the public, or any portion thereof, for which compensation is required such corporation or person is hereby declared to be a public utility subject to the jurisdiction and regulation of the Public Service Commission, the Office of Regulatory Staff, and Articles 1, 3, and 5 of this chapter to the extent of its activities within the State.

S.C. Code Ann. § 58-5-10(4), (5) (2015) (emphases added).

"The cardinal rule of statutory construction is to ascertain and effectuate the intent of the legislature." *Hodges v. Rainey*, 341 S.C. 79, 85, 533 S.E.2d 578, 581 (2000). "Where the statute's language is plain and unambiguous, and conveys a clear and definite meaning, the rules of statutory interpretation are not needed and the court has no right to impose another meaning." *Id.* "Only where the language of an act gives rise to doubt or uncertainty as to legislative intent may this Court search for that intent beyond the borders of the act itself." *Creswick v. Univ. of S.C.*, 434 S.C. 77, 82, 862 S.E.2d 706, 708 (2021). "The best evidence of legislative intent is the text of the statute." *Id.*

We view the statute at issue as plain and unambiguous and, like the Commission, see nothing in this record to establish that Respondents furnished or supplied water or sewer to Appellants for compensation. While Respondents do not dispute that they receive service through Berkeley County Water & Sanitation, Charleston Water System, and Spartanburg Water System, they persuasively argue that they merely provide an allocation method and billing function rather than the services themselves.

Appellants rely on *Anchor Point, Inc. v. Shoals Sewer Co.* to support their position that Respondents operate as public utilities, but this case is easily distinguished from the matter before us. 308 S.C. 422, 418 S.E.2d 546 (1992). In *Anchor Point*, our supreme court considered whether, under section 58-5-10(4), a nonprofit organization created to provide sewerage to condominiums was a public utility subject to Commission regulation. *Id.* at 425-27, 418 S.E.2d at 547-49. Although the sewerage was provided on a not-for-profit basis, the supreme court concluded, "Based on the facts before us and the broad language of the statute, we think that Shoals Sewer is a public utility as it serves a limited portion of the public." *Id.* at 426, 418 S.E.2d at 548. But *Anchor Point* did not involve a mere submetering or allocation arrangement because the homeowners' association in that case owned

and operated that sewer plant system.  *Id.* at 424, 418 S.E.2d at 547. Distinguishing *Anchor Point* from Appellants' case, the Commission explained, "[Respondents] do not have any monopoly rights over any service area; do not own any large, capital-intensive utility infrastructure; and do not seek or obtain any guaranteed rate of return on the pass-through billing of water and sewer services."

Still, based on definitions of "supply" and "furnish," Appellants argue Respondents were furnishing and supplying water and sewerage to Appellants and other tenants:

> Respondents provided pipes between the area-wide utility connection and fixtures in the apartments that made water and sewerage available to Appellants and other tenants for their use.  Respondents were taking water from the area-wide utility into pipes owned by Respondents, transporting that water to faucets, shower heads, and other outlets owned by Respondents, and providing the water to Appellants and the other tenants at those outlets.  Similarly, Respondents were accepting wastewater into pipes owned by Respondents and using those pipes to transport the wastewater to sewer pipes owned by area-wide utilities.

Although this is a creative argument, we agree with Respondents that mere "ownership of the pipes that water and sewerage pass through, without the ability to control the flow of service" does not constitute ownership of the water and sewerage.[2]

Next, based on a common definition of "compensation," Appellants argue Respondents were providing water and sewerage for compensation because in addition to their water and sewer allocation formula charge, tenants were charged a monthly service fee.  Appellants further claim that because they were never able to engage in full discovery before the Commission, they do not know if Respondents are making a profit by charging more for the water than they pay for it.  Yet, the record includes an affidavit from Andrew Gordon, chief operating officer of parent

---

[2] It is undisputed that Respondents lack "the ability to turn off water or sewer service to individual tenants."  They further lack "the ability to control the flow of water or sewer service in a tenant-specific capacity and therefore could not exercise control of the commodities."

company Strata Equity Group, stating Respondents "contracted with the third-party billing company, Conservice, to recover the actual costs of water and sewer services to its tenants through an allocation formula method on a not-for-profit basis." And as previously noted, the Audubon lease includes a "Utility and Services Addendum," providing water and sewer utilities "will be billed by the service provider to us and then allocated to you based on the . . . the number of persons residing in your dwelling unit." Similarly, the Veridian leases include a "Utility and Services Addendum," providing water and sewer "will be billed by the service provider to us and then allocated to you based on . . . a combination of square footage of your dwelling unit and the number of persons residing in your dwelling unit."

Also helpful to our analysis is the Utility Management & Conservation Association's (UMCA) letter opposing Appellants' position:

> A utility allocation method, also known as Ratio Utility Billing Systems (RUBS), is an alternative method of tenant billing of utilities, in contrast to sub-metering (a method used to measure actual utility usage), as a means of recovering the utility expense billed by a utility provider to a landlord for usage consumed by the tenants. RUBS is a common practice used by property owners nationwide that divides the utility expense proportionally between the tenants based on a mutually agreed-upon formula . . . . Due to the nature of utilities and outdated building infrastructure, RUBS is the most cost-efficient utility allocation mechanism for many buildings that lack a preexisting sub-meter infrastructure. In such buildings, the addition of sub-meters is often cost prohibitive, or simply infeasible. The use of RUBS does not provide a means for a landlord to profit from its utility billing to tenants, but simply a means of reimbursement of utility costs borne by tenants, yet assessed against landlords.

(footnote omitted).

Finally, Appellants argue Respondents benefited from providing water and sewerage to Appellants and other tenants because they billed tenants for usage in common areas such as the leasing office, gym, pool, and irrigation system. This is

a reasonable argument, but it does not change the analysis of whether Respondents "furnish" or "supply" water or sewerage. As the Commission cogently explained:

> Billing tenants for water and sewerage used in the common areas conferred a benefit on [Respondents] because they were thus able to take what should be an operating expense and have the tenants pay those expenses. The fact that such operating expenses would presumably otherwise be included in the rent charged for apartments at the properties does not alter the fact that [Respondents] obtained a benefit from billing tenants for common area water and sewerage usage, and to the contrary, this further proves the point. By not having to include the water and sewerage expenses for the common areas in the rent, [Respondents] were able to either: (1) keep rents at the prevailing market rates but, due to the decreased expenses for water and sewerage, obtain an increased profit from the rent or (2) lower rents below the prevailing market rate to make [Respondents'] rents more competitive and thereby increase occupancy and earn increased profits. Additionally, by not having to include water and sewerage in the common areas in operating expenses, [Respondents] benefited by being able to use excessive amounts of water and sewerage to further their profit interests without any concern for costs.

In sum, we see no error in the Commission's ruling that under the plain language of section 58-5-10(4), Respondents did not operate as a public utility.[3]

## II.    Deviation from Prior Orders

Appellants next argue the Commission's decision was arbitrary and capricious because it deviates from prior orders without a reasoned basis for such deviation. With some effort, we were able to locate some of the referenced orders via the

---

[3] Appellants further assert that to the extent section 58-5-10(4) might be ambiguous, the Commission erred in finding Respondents did not operate as a public utility. Because neither Appellants nor Respondents actually argued the statute is ambiguous—and because the Commission made no such finding—we decline to address any question of ambiguity.

Commission's docket management system.  And we note that in its September 10, 2021 order initially dismissing the federal action without prejudice, the district court recognized:

> The parties disagree as to the meaning and effect of *In re Rule to Show Cause on Submeterers*, wherein the Commission vacated its prior Order No. 1999-[307] "in which this Commission ordered a rulemaking to determine specific requirements for certification and regulation of submeterers." 2003 WL 23325952.  In the prior Order No. 1999-[307], the Commission stated "[w]e believe that landlords and companies that submeter and bill tenants for water and/or wastewater services are indeed public utilities, and should be certified by this Commission." *In re Generic Proceeding Related to Sub-Metering of Electric, Water and Wastewater Services*, Order No. 1999-307 (S.C.P.C. May 4, 1999), filed at ECF No. 17-5 at 5.  *Because the Commission specifically vacated Order No. 1999-[307] in Order No. 2003-214*, Defendants assert that the Commission has determined that apartment complexes are not public utilities.

*Zito*, No. 2:20-CV-3808-BHH, 2021 WL 4137553, at *3 n.4 (emphasis added).  Thus, we find the Commission's decision was neither arbitrary nor capricious and did not deviate from prior orders without a reasoned basis.

## III.    Findings of Fact

Finally, Appellants argue the Commission erred in making factual findings not supported by substantial evidence and immaterial under section 58-5-10(4) and its own prior orders.  Again, we disagree.

In Order 736, the Commission made the following findings of fact:

> 1. [Respondents] do not have water or sewer submetering infrastructure in either apartment building at issue in this proceeding.

2. [Respondents] contracted with a third-party billing provider, Conservice, to provide the billing functions for water and sewer service to resident units, and did not bill tenants directly, nor did [Respondents] contract directly with any utility providers for service to resident units.

3. [Respondents] contracted with Conservice to recover the actual costs of water and sewer services to its tenants through an allocation formula method on a not-for-profit basis.

4. [Respondents] do not have any monopoly rights over any service area; do not own any large, capital-intensive utility infrastructure; and do not seek or obtain any guaranteed rate of return on the pass-through billing of water and sewer services.

5. The water and sewer services are provided to the properties by local utilities and [Respondents] never take possession of the water and lack the ability to disconnect the water or sewer service to an individual tenant for non-payment.

6. [Respondents] are not operating a public utility that is subject to the jurisdictional authority of the Commission.

The Commission then concluded, "Merely providing metering services and a billing function is not sufficient activity to be considered a 'public utility' as defined in [section 58-5-10(4) of the South Carolina Code]. Such an arrangement does not subject the submeterer to the jurisdiction of the Commission." This legal conclusion is sound, and substantial evidence supports the Commission's factual findings.

**Conclusion**

Appellants receive service through municipal utility systems; Respondents provide submetering and a billing function. As the substantial evidence in the record supports the Commission's findings and the Commission properly found it lacked subject matter jurisdiction, the orders of the Public Service Commission are

**AFFIRMED.**

**KONDUROS and VINSON, JJ., concur.**